In the Interest of D.G.K., S.L.H., P.H., V.D., S.A.H., and S.D.D., Juvenile Officer, Respondents,

v.

H.H., Appellant.

No. WD 38033.

Missouri Court of Appeals,
Western District.

Nov. 18, 1986.

Donald G. Scott (Dietrich, Davis, Dicus, Rowlands, Schmitt and Gorman, of counsel), Kansas City, for appellant.

Joan Moran and Debra J. Wilson, Kansas City, for respondents.

Before PRITCHARD, P.J., and KENNEDY and LOWENSTEIN, JJ.

PRITCHARD, Presiding Judge.

Appellant, H.H., is the natural mother of six children: A son, V.J.D., born March 2, 1974, whose father was said to be Virgil Jerome Winston (who was not served with summons or made a party, and did not appear in court); a daughter, S.D.D., born March 22, 1976, whose father appears to be respondent, P.H., whom H.H. married on October 31, 1976; a son, P.H., born October 1, 1977, the child of P.H.; a son, S.L.H., born September 28, 1979, said to be the child of one Otis Cole (who was not served with summons, or made a party, and did not appear in court); a daughter, S.A.H., born June 15, 1981, said to be the child of one Rufus Thomas (who was not served with summons, or made a party, and did not appear in court); and a son, D.G.K., born June 5, 1984, the child of respondent, D.K.

The trial court awarded custody of V.J.D. to H.H. under the supervision of the Division of Family Services. The custody of S.D.D., P.H., S.L.H. and S.A.H. was awarded to respondent, P.H., and D.G.K.'s custody was awarded to respondent, D.K., both awards being also under the supervision of the Division of Family Services. Neither P.H. nor D.K. have filed briefs in this court.

It is the contention of appellant as to the judgments of custody that the children were without proper care, custody or support is not supported by the evidence.

The petitions in the interest of each of the minor children allege in Counts I that "The child is without proper care, custody or support in that [the] mother habitually leaves the child and her five minor siblings alone in the home without adult supervision. Instances of such behavior by the mother include: On or about the morning of April 5, 1985, when the child and four minor siblings were left in the home without supervision, on or about 10:00 P.M., April 5, 1985, when three of the child's siblings, P.H., age 7; S.A.H., age 3 and S.L.H., age 5, were found alone without adult supervision and on or about April 11, 1985, when the child's sibling, D.G.K., age 10 months, was found alone in the home without adult supervision and, when the mother returned home she was highly intoxicated."

Janis Ferguson, a social worker with the Division of Family Services, investigated a hotline complaint against H.H., and on April 11, 1985, went to the home about 10:30 a.m. She knocked on the door, which was slightly ajar causing her to figure there must be someone home. She waited about five minutes and D.K. "came to the door and he invited me in and ran upstairs and came back downstairs with the baby [D.G.K.]. Q. Had you entered the residence before [D.K.] introduced himself? A. No. Q. How long were you there, approximately, before [D.K.] arrived? A. At least five minutes, possibly longer. Q. When you and [D.K.] entered the residence did you check to see if there was anyone inside? A. There was no one in the front room. [D.K.] ran upstairs, leaving me in the living room. When he came back downstairs, he had the baby [D.G.K.], with him." In about ten minutes, H.H. arrived, Ms. Ferguson heard her yelling up the block before she got to the door. When H.H. came in she and D.K. began arguing loud and yelling at each other, and P.H. was carrying a beer can and drinking from it. During the argument with D.K., H.H. denied that she had been gone out all night and that she had stolen his car.

The testimony of Ms. Ferguson does not establish with certainty whether D.K. came to the door from inside the house or from its exterior. The testimony is, however, subject to the inference that he *arrived* from outside the house, and that the infant, D.G.K., was alone in it for some period of time.

P.H. testified that his daughter called him on April 6, 1985 (later changed to a Friday, April 5), telling him that the chil-

dren were being left alone. He went to H.H.'s home, arriving about 8:00 p.m. to pick up his kids, and found all of the children, except V.J.D., there. Although P.H. testified that H.H. was there when he arrived, that appears to be in error in view of this further testimony that he put the children to work cleaning the house, which was a shambles, helped them in that work for about thirty minutes, then "went around the corner (to H.H.'s mother's house) to see if she was there and she still had not gotten there." P.H. returned to the home and stayed there about an hour. He went back around the corner to her mother's house to see if she knew where H.H. was, and when he returned to the home, H.H. was there, in a drunken condition. P.H. was asked, "Q. Have you ever had occasion to find the children left unsupervised before? A. Oh, yes. Q. Do you know how many times you have found the children unsupervised in her home? A. Plenty of times. Q. Would you say it has been more than five times, or less than five times? A. Definitely. Q. Do you know about how many times it has been that you have found the children unsupervised? A. Basically, any time I come unannounced, mainly on Fridays and Saturdays nights." At another point in the hearing, P.H. testified that he had found the children unsupervised more than ten times.

James Rauch, assistant director of the Mattie Rhodes Center, had S.D.D. in a summer camp in 1984, and had her in group therapy from September, 1984 to March of 1986. It was his practice to take the children home after the group therapy sessions, which ended around 5:00 to 6:00 p.m. On four occasions, when he brought S.D.D. to her home, there was no one there, and the child was taken to her grandmother's. On a fifth occasion, the therapy group had gone to a circus, and no one was present in H.H.'s home when they got there about 10:30 p.m.

Appellant says there is no evidence to support the specific allegations that the children were found alone without adult supervision on April 5, 1985. P.H. did testify that H.H. was home on April 6, 1985,

when he got there, but that date was changed to April 5, as noted. The allegation is that H.H. *habitually* left the children alone, and in addition to the specific instances, P.H. testified that he had found the children left unsupervised "plenty of times"—definitely more than five or less than five times (which is not clear); and "Basically any time I come unannounced, mainly on Fridays and Saturdays nights." He further testified that he found the children unsupervised more than ten times. P.H. testified further that his weekend appearances occurred from the fall of 1984 to April, 1985, when the children were removed from H.H.'s custody, a period of about six months.

■ Appellant argues that the allegation of Count I fails to conform to the requirements of Rule 114.01 in that it does not set forth plainly and concisely, with reasonable particularity "(3) the facts which bring the juvenile within the jurisdiction of the juvenile court, including the date, place and manner of the acts alleged and the law or standard of conduct, if any, allegedly violated by the acts; * * *." The petition does allege with particularity two occasions, April 5 and April 11, 1985, as two specific instances when the children were left alone, unsupervised, by H.H. It does not, however, allege any further dates that H.H. *habitually* left the children alone. The evidence is from P.H. that there were so many times that he could not remember the dates, but they were between the fall of 1984 to April, 1985, more than ten times. In this situation, Count I of the petition may be deemed to have been amended to conform to the proof, as was done in *Matter of Dunn*, 620 S.W.2d 46, 48 (Mo.App. 1981), which applied Rule 55.33(b), held not to be inconsistent with any rule specifically governing juvenile proceedings, and under Rule 110.04, Rule 55.33(b) was applicable. In the Dunn case, as here, there was no objection to P.H.'s testimony. Thus, the evidence was sufficient that H.H. did habitually leave the children alone for at least a six month period. The evidence is clear and convincing as to those acts on H.H.'s

part, and the juvenile court was not without jurisdiction to adjudge the custody matters presented. Compare *In the Interest of A.K.S. and S.L.H.*, 602 S.W.2d 848 (Mo. App.1980).

There is an allegation in Count II of S.D.D.'s petition that she was sexually abused by D.K., but no evidence was presented as to that matter, as respondent concedes.

■ Count III of S.D.D.'s petition, and Counts II of the petitions as to the other children, allege that S.D.D. was repeatedly struck by the mother with a coat hanger and a belt, and the mother pulled her hair and pushed her down some stairs, resulting in a two inch abrasion on her right leg, and each child is at risk of similar abuse. There is no evidence that H.H. repeatedly struck S.D.D. with a coat hanger. She was struck once (date not known) with a coat hanger when she did not get H.H. something "in a hurry". There was no evidence that H.H. pushed S.D.D. down some stairs causing an abrasion on her leg. Although appellant did admit that she pulled S.D.D.'s hair on one occasion to impress upon her not to curl her hair, no date was given. H.H. also admitted, and P.H. testified, that she had hit the children with belts in the past, no evidence was adduced that S.D.D. was struck with a belt on the date alleged. There is no showing that any of these acts were above and beyond normal disciplinary measures, and there was no showing that injuries were received by any child, or that they were at risk of injury because of the alleged acts. There is no substantial evidence to support the allegations of Count III as to S.D.D. or Counts II as to the others so as to be a basis for the removal of their custody from appellant.

Appellant's last point is that the trial court was without jurisdiction because the natural fathers of V.J.D., S.L.H., and S.A.H. are indispensable parties in that they have an interest in the subject matter of the action—their right to custody of their respective children. The whereabouts of the father of V.J.D. is alleged in the petition as to him to be unknown. Thus, it is plain that personal service or registered or certified mail service of summons could not be had upon him. The petitions in the cases of S.L.H. and S.A.H. allege that P.H. is their father.

■ P.H. testified that he married H.H. on October 31, 1976. Although P.H. had filed a petition for dissolution of the marriage, no decree had been entered as of the date of this trial, December 30, 1985. S.L.H. and S.A.H. were born during the existence of the marriage, creating a presumption that P.H. was the father of these two children. Although P.H. testified that other men were the fathers of S.L.H. and S.A.H., that is a conclusion not buttressed by any evidence of his non-access to H.H., or upon any evidence, such as blood tests, of non-paternity. As was said in *L.M.K. v. D.E.K.*, 685 S.W.2d 614, 616[4-7] (Mo.App. 1985), "There is no stronger presumption in law than the presumption that a child born during wedlock is the child of the husband. (Citing cases.)" Upon this record, P.H. must be deemed to be the legal parent of both S.L.H. and S.A.H., and as such, the only person in that status required to be before the court.

Considering the superior opportunity of the trial court to see and observe the witnesses, including H.H., and to adjudge their credibility, the judgment is supported by substantial evidence; it is not against the weight of the evidence; and it does not erroneously declare the law.

The judgment is affirmed.

All concur.